PORTUGUESE AMERICAN LEADER-SHIP COUNCIL OF THE UNITED STATES, INC., Appellant,

v.

INVESTORS' ALERT, INC., et al., Appellees.

No. 04–CV–1187.

District of Columbia Court of Appeals.

Argued June 7, 2007.

Decided Sept. 11, 2008.

---

Stephen H. Ring, with whom Eric J. Menhart was on the brief, for appellant.*

Before RUIZ, FISHER, and THOMPSON, Associate Judges.

RUIZ, Associate Judge:

This appeal stems from the dismissal of appellant's action for money damages and attorney's fees for alleged violations of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA" or "Act") which prohibits the sending of unsolicited advertisements to fax machines. *See id.* § 227(b)(1)(C). Appellant, a non-profit organization located in the District of Columbia, filed a class action on behalf of non-profit organizations and others located in the District who have received unsolicited faxes—newsletters titled "Investors' Alert"—from appellees. The trial court granted appellees' motions to dismiss after interpreting the TCPA provision that private actions may be filed in state courts "if

---

* Counsel for appellees submitted a statement in lieu of brief stating that they were unable to contact their clients and therefore were not authorized to file a brief.

otherwise permitted by the laws or rules of Court of a State" to mean that a state (which under the TCPA includes the District of Columbia) must affirmatively adopt enabling legislation opting to permit private lawsuits to be brought under the Act—something the District of Columbia has not done. Alternatively, the trial court based its dismissal of the complaint against some of the defendants on a determination that they were "service providers" not liable under the TCPA for sending the unsolicited faxes.

■ We interpret the TCPA differently and hold that private causes of action may be brought in Superior Court under the Act without the need for enabling legislation in the District of Columbia. As the TCPA provides a legal basis for appellant's claims, the trial judge's dismissal of the complaint for failure to state a claim was legal error. We also reverse as premature the trial court's dismissal on the alternative ground that some of the defendants acted only as "service providers," and therefore are not liable under the Act. The complaint alleged otherwise and, in the absence of discovery, the trial court did not have the information necessary for a full appraisal of their roles and activities in the development and distribution of the unsolicited faxes. Accordingly, we reverse and remand the case for further proceedings.

## I.

The complaint alleges that from 1997 to 2001, Investors' Alert, Inc., a company that publishes a newsletter with stock tips titled "Investors' Alert," sent out as many as 50,000 unsolicited faxes a day to a wide number of facsimile machines, including those used by appellant and other members of the purported class.[1] According to the complaint, the newsletters are written by Thomas E. Loyd under the company names Loyd Financial Consulting and Access Financial Consulting. A typical newsletter describes a company and predicts that its stock will soon jump in price. The complaint alleges that the purpose behind the stock tips was to raise the price of Loyd's low-value stocks, which he would then sell *en masse.* This is known as a "pump and dump" stock manipulation scheme.[2]

In addition to Investors' Alert, Inc., twelve defendants are alleged to have participated in the distribution of the unsolicited newsletters. See note * on p. 1. One group—Loyd Financial Consulting, Access Financial Consulting, and Pecan Tree Consulting—was located in Texas and controlled by Loyd. Another group includes World Wide Marketing, Inc., Media Stealth.com, LLC, Michael Cole, and Douglas Black, all hired by Loyd as marketers. Texas companies Cynet, Inc. and Cynet of Texas, Inc., as well as Florida company Vision Lab Telecommunications, are alleged to have prepared and faxed the newsletters. Loyd is named as an individual defendant. The complaint also alleges that an unnamed securities promoter (defendant "John Doe") hired Loyd Financial to issue articles about several stocks, and sold Loyd's stocks.

## II.

■ The TCPA, enacted by Congress in 1991, prohibits the sending of unsolicited

---

1. The trial court deferred class certification issues.

2. In fine print on the bottom of the page, the newsletters disclose that Loyd Financial Consulting/Access Financial Consulting are paid in the advertised company's stock by Pecan Tree Consulting, Inc., a company also owned and controlled by Loyd, or directly by the advertised company.

faxes containing advertisement. *See* 47 U.S.C. § 227(b)(1)(C). The Act seeks to address the increased use of automated telephone equipment to make telephone calls in bulk and fax unsolicited advertisements that cross state lines and fall outside the regulatory jurisdiction of individual states. In introducing one of the bills that would eventually become law, its sponsor, Senator Hollings of South Carolina, noted:

> The telemarketing industry appears oblivious to the harm it is creating. Two months ago, a representative of the Direct Marketing Association said on television that telemarketers have a right to call us in our homes. This is absurd. I echo Supreme Court Justice Louis Brandeis, who wrote 100 years ago that "the right to be left alone is the most comprehensive of rights and the one most valued by civilized man."
>
> Mr. President, I originally introduced this bill on July 11 of this year. Since then, my constituents in South Carolina and citizens around the country have deluged my office with letters of support for this bill. Senator Inouye, the chairman of the Communications Subcommittee, held a hearing on the bill on July 24. Not one party at that hearing testified in opposition to the bill. Because of the enormous public support, the bill was ordered reported by the Commerce Committee, which I chair, and without objection on July 31.
>
> Mr. Steve Hamm, administrator of the Department of Consumer Affairs in South Carolina, informed me that his office receives more complaints about computerized telephone calls and 900 numbers than any other problems. Despite the fact that South Carolina recently passed legislation to protect consumers from unwanted computerized calls within our State, South Carolina consumers continue to suffer from com-

puterized calls made from out-of-State. The State law does not, and cannot, regulate interstate calls. Only Congress can protect citizens from telephone calls that cross State boundaries. That is why Federal legislation is essential.

137 Cong. Rec. 30821.

At the time the federal statute was being considered, states had begun to take action to restrict unsolicited telemarketing practices. *See* S.Rep. No. 102–178 at 3; H.Rep. No. 102–317, 1st Sess., at 25 (1991). The District of Columbia, for example, in 1991 banned the use of automated telephone dialing systems for commercial solicitation, *see* D.C.Code § 34–1701 (2001) ("A person may not use an automated dialing, push-button, or tone-activated address signaling telephone system with a prerecorded message for the sole purpose of: (A) Soliciting a person over the telephone to purchase or lease goods, services, or real property . . . ."), but has not enacted a similar statute prohibiting "junk faxes." As Senator Hollings noted, however, state action could not address the problem of interstate calls.

The proposal before the Congress was comprised of two bills. One bill, sponsored by Senator Hollings, provided for regulations regarding automatic dialing system calls and unsolicited advertisements by fax machines. *See* 137 Cong. Rec. 30820–21. The other bill, sponsored by Senator Pressler of South Dakota, addressed phone calls from "live persons." *See* 137 Cong. Rec. 30824. Upon reaching the Senate floor, neither bill addressed private causes of action.

On November 7, 1991, both Senator Hollings and Senator Pressler amended their respective bills to provide for private causes of action in state courts, and Congress incorporated these provisions in the final legislation, one for automatic tele-

phone calls and fax transmissions, *see* 47 U.S.C. § 227(b)(3), and another dealing with certain unwanted live telephone contacts, *see* 47 U.S.C. § 227(c)(5). The language relevant to this appeal—"if otherwise permitted by the laws or rules of court of a state"—is identical in both provisions.

47 U.S.C. § 227(b) concerning unsolicited faxes provides as follows:

Restrictions on use of automated telephone equipment.

(1) Prohibitions. It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

. . .

(C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement;

. . . .

(3) Private right of action. A person or entity may, *if otherwise permitted by the laws or rules of court of a State,* bring in an appropriate court of that State—

(A) an action based on a violation of this subsection or the regulations prescribed

under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

(emphasis added).

The TCPA provides several modes of enforcement. A state's attorney general, *see* 47 U.S.C. § 227(f), and the Federal Communications Commission, *see id.* § 227(b)(2), can bring a violator into compliance. A third course provided is that a "person or entity may, *if otherwise permitted by the laws or rules of court of a State,* bring in an appropriate court of that State . . . an action based on a violation" of the Act. *See id.* § 227(b)(3)(A) (emphasis added).[3] The question presented in this appeal is what Congress intended by the phrase "if otherwise permitted by the laws or rules of court of a State."

The trial court interpreted the "if otherwise permitted" language in the TCPA to mean that before a private right of action can be exercised, a state must "opt in" through enabling legislation that allows the lawsuits to proceed.[4] Because the Dis-

---

**3.** Unusually, the TCPA, a federal statute, does not permit a cause of action to be filed in federal court. *See, e.g., Murphey v. Lanier,* 204 F.3d 911, 915 (9th Cir.2000); *Foxhall Realty Offices, Inc. v. Telecomms. Premium Servs., Ltd.,* 156 F.3d 432, 435 (2d Cir.1998); *Int'l Sci. & Tech. Inst., Inc. v. Inacom Communic'ns, Inc.,* 106 F.3d 1146, 1152 (4th Cir. 1997).

**4.** Quoting the dictionary, the trial court noted that " '[O]therwise[ ]' is defined as 'in another way[,]' " and that " '[p]ermit' is defined as (1) to consent to and (2) to give permission to or for." WEBSTERS II NEW RIVERSIDE UNIVERSITY DICTIONARY 833, 877–78 (2d ed.1984), and reasoned that

[P]utting the two definitions together in context, a person may bring a private state

action if the state laws or rules *consent to private actions or give permission for private actions, in another way.* Stated differently, the state must take some affirmative action to allow a private right of action. An argument that state silence authorizes a private action until the state takes permission away, simply cannot be read into the plain meaning of the text.

The trial court also read Senator Hollings' floor statement, quoted *supra,* as intending "that State Legislatures can decide the extent to which the local courts are burdened with these private lawsuits, and what, if anything, must be done to remedy the problem so as to maintain the right to sue or to limit this right. Naturally, this can dissolve into a blunt matter of whether to appropriate more money to pay for judicial resources associated with this

trict of Columbia does not have such enabling legislation, the trial court dismissed the complaint for failure to state a claim. We review *de novo* the dismissal of a complaint for failure to state a claim. *See In re Estate of Curseen*, 890 A.2d 191, 193 (D.C.2006) ("Because a motion to dismiss a complaint under Rule 12(b)(6) 'presents questions of law, our standard of review ... is *de novo.*'" (citations omitted)).

### III.

■ We begin our analysis by discussing the implications of the Supremacy Clause of the United States Constitution. The Supremacy Clause states that "[T]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... *shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby,* any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2 (emphasis added). In interpreting the Supremacy Clause, the Supreme Court has held that

> Federal law is enforceable in state courts not because Congress has determined that federal courts would other-

wise be burdened or that state courts might provide a more convenient forum ... but because the Constitution and *law passed pursuant to it are as much laws in the States as laws passed by the state legislature.* The Supremacy Clause makes those laws "the Supreme Law of the Land," and charges state courts with a coordinate responsibility to enforce that law according to their regular modes of procedure.

*Howlett v. Rose,* 496 U.S. 356, 367, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). The Court went on to conclude that "[a] state court may not deny a federal right, when the parties and controversy are properly before it, in the absence of 'valid excuse.'" *Id.* at 369, 110 S.Ct. 2430 (quoting *Douglas v. New York, N.H. & H.R. Co.,* 279 U.S. 377, 387–88, 49 S.Ct. 355, 73 L.Ed. 747 (1929)). Thus, the default rule is that federal laws are enforceable in state courts, unless there is "an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 478, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981). There is therefore a fundamental tension

type of litigation." The problem of increasing the burden on D.C. courts without enabling legislation is exacerbated in the case of the District of Columbia, in the trial court's view, because the Council of the District of Columbia has "no authority to provide concomitant funding to pay for accommodating those suits in the local courts ... [or] the authority to alter the size of the Court itself ... [or] to alter the fundamental organization of the Superior Court.... All of this is within the exclusive province of the United States Congress." The trial court concluded:

> These basic facts of life about the District of Columbia are more than sufficient to demonstrate the vagaries of presuming that there is an unfettered private right of action imposed upon the Courts of the District of Columbia by the mere existence of the federal statute. Such problems do not exist

among the states. Thus, this Court concludes that in order for a private right of action to exist in the District of Columbia Courts under the TCPA, the Council of the District of Columbia must expressly say so. Otherwise, there is potential for this court to be overwhelmed with TCPA actions, but stranded without resources to handle those actions.

Above all, whether a legislature has "opted in" or "opted out," neither the United States Congress nor the Council of the District of Columbia has "opted" either way for the District of Columbia as a discrete jurisdiction. The total lack of such a decision is sufficient to justify granting the instant Motion to Dismiss, because there has been no legislative action making any conscious choice at all.

between an interpretation of the TCPA that would require the Council of the District of Columbia to pass enabling legislation before a private action may be brought in Superior Court and the rule of presumed enforceability derived from the Supremacy Clause. In our view, the language of the TCPA, its purpose and legislative history support resolution of that tension in favor of enforceability without prior conditions.

First, we agree with the observation of the Maryland Court of Appeals that "[t]he phrase 'if otherwise permitted by the laws or rules of court of a state' certainly appears to refer to the neutral general jurisdictional and procedural laws and rules governing each state's court system." *R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.,* 382 Md. 689, 857 A.2d 1, 14 (2004). Such a reading comports with the presumed enforceability of federal law in state courts under the Supremacy Clause.[5]

Moreover, this view is supported by the TCPA's legislative history. In introducing the amendment containing the private cause of action codified at 47 U.S.C. § 227(b)(3), Senator Hollings set forth some of his *procedural* concerns regarding the new provision:

> The ... bill contains a private right-of-action provision that will make it easier for consumers to recover damages from receiving these computerized calls. The provision would allow consumers to bring an action in State court against any entity that violates the bill. *The bill does not, because of constitutional constraints, dictate to the States which court in each State shall be the proper venue for such an action, as this is a matter for State legislators to determine.* Nevertheless, it is my hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims court. The consumer outrage at receiving these calls is clear. Unless Congress makes it easier for consumers to obtain damages from those who violate this bill, these abuses will undoubtedly continue.
>
> Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer. However, it would defeat the purposes of the bill if the attorneys' costs to consumers of bringing an action were greater than the potential damages. I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill.

137 Cong. Rec. 30821–22 (emphasis added). The senator's comments make clear that it was up to the states to determine "which courts" would hear TCPA claims. *See Consumer Crusade, Inc. v. Affordable Health Care Solutions, Inc.,* 121 P.3d 350, 355 (Colo.2005) ("[W]hen Congress created a private right of action that could be prosecuted in state courts, 'if otherwise permitted by the laws or rules of court of a state,' it was acknowledging that the states could apply their own rules of procedure....").

Rulings by the Federal Communications Commission also support that no enabling legislation is necessary. In the area of telephone solicitations, the FCC has ruled

---

5. In denying the motion to set aside the dismissal, the trial court rejected appellant's argument based on the Supremacy Clause because it had "focused squarely on the internal language of the TCPA." Although we agree with the trial judge that the precise legal issue is one of statutory interpretation, focused on the language used in the statute, that exercise must itself be conducted within the larger context of the Supremacy Clause and the presumption it creates that federal laws are enforceable in state Courts.

that the TCPA allows consumers to file suit in state court, unless the state has enacted rules to the contrary:

> The TCPA provides consumers with a private right of action, if otherwise permitted by state law or court rules, for any violation of the autodialer or prerecorded voice message prohibitions and for any violation of the guidelines for telephone solicitations. *Absent state law to the contrary, consumers may immediately file suit in state court if a caller violates the TCPA's prohibitions* on the use of automatic telephone dialing system and artificial or prerecorded voice messages.

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C.R. 8752, 8780, 1992 WL 690928 (1992) (emphasis added) (citations omitted) (hereinafter *FCC Regulations Implementing the TCPA (1992)* ). We defer to the FCC's reasonable interpretation of a statute it is charged with implementing. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As the operative language of the TCPA is the same with respect to suits to enforce the prohibition against telephone solicitations and unsolicited advertisement via fax machine, *compare* 47 U.S.C. § 227(b)(3), *with id.* § 227(b)(1)(A), we conclude that the FCC would come to the same interpretation as to both.

A majority of state courts hold that enabling legislation is unnecessary to make the TCPA's private action provision enforceable in state courts. For example, the Maryland Court of Appeals, ruling on the same issue involving the same parties before us, held that even without enabling state legislation, "Maryland trial courts have jurisdiction over the private cause of action created by 47 U.S.C. § 227(b)(3)." *R.A. Ponte Architects, Ltd.*, 857 A.2d at 18.

The court deemed the phrase "if otherwise permitted by the laws and rules of a court of a State" to be an "express[ion of] the Congressional recognition that neutral state laws and rules ... are applicable to the federal cause of action." *Id.* at 11. Similarly, the Supreme Judicial Court of Massachusetts has held that "47 U.S.C. § 227(b)(3) does not require a State to pass enabling legislation before private claims may be brought in its State courts." *Mulhern v. MacLeod*, 441 Mass. 754, 808 N.E.2d 778, 779 (2004). The *Mulhern* court concluded that the "if otherwise permitted" language in the TCPA was "more likely intended to reflect that Federal claims remain subject to State procedural law...." *Id.* at 780. The court reasoned that "[t]he TCPA was crafted to accommodate State interests, while respecting the structure, jurisdiction, and procedural rules of State courts." *Id.* at 780–81 (footnote omitted). Based on similar reasoning, most state courts that have considered the issue, have concluded that a private cause of action under the TCPA may be brought in state court without specific enabling legislation, and foreclose such actions only if there is a state law or rule of procedure that precludes it. *See Lary v. Tom Taylor Agency*, 878 So.2d 1165, 1167 (Ala.Civ.App.2003) (noting that in a similar case "we rejected the proposition that states must actively 'opt in' with respect to the TCPA's enforcement provisions in order for private parties to be able to seek damages or penalties under 47 U.S.C. § 227(b)(3)"); *Kaufman v. ACS Sys., Inc.*, 110 Cal.App.4th 886, 2 Cal.Rptr.3d 296, 306 (2003) (noting that "a person may file a TCPA action in state court as long as the state has not prohibited it"); *Condon v. Office Depot, Inc.*, 855 So.2d 644, 646–47 (Fla.Dist.Ct.App.2003) (joining the majority view concluding "that the State is not required to adopt enabling legislation before a state court of competent jurisdiction

can entertain" a private right of action under TCPA); *Carnett's, Inc. v. Hammond*, 279 Ga. 125, 610 S.E.2d 529, 530 (2005) (holding that TCPA "provides a private right of action in state court unless prohibited by state law"); *Reynolds v. Diamond Foods & Poultry, Inc.*, 79 S.W.3d 907, 910 (Mo.2002) (en banc) ("[T]he TCPA does not condition the right to bring a private cause of action ... on a state's adoption of specific legislation permitting such suits."); *Edwards v. Direct Access, LLC*, 121 Nev. 929, 124 P.3d 1158, 1160 (2005) (noting that "a separate state law or rule of court conferring jurisdiction to consider TCPA claims in state court is not necessary for the state court to have jurisdiction over the federal claim"); *Zelma v. Konikow*, 379 N.J.Super. 480, 879 A.2d 1185, 1188 (2005) (" '[I]f otherwise permitted by' state law and court rules was intended to provide states an opportunity to 'opt-out' of the TCPA and to recognize

that states may apply neutral rules and procedures to foreclose TCPA actions."); *Kaplan v. Democrat & Chronicle*, 266 A.D.2d 848, 698 N.Y.S.2d 799, 800 (N.Y.App.Div.1999) (ruling that in the "absence of a State statute declining to exercise the jurisdiction authorized by the [TCPA], a State court has jurisdiction over TCPA claims").[6]

Based on the text of the statute, its purpose and legislative history, and the FCC's authoritative interpretation, we agree with the great majority of courts that Congress did not intend to require enabling legislation before a private cause of action under the TCPA may be brought in our courts.[7] As the "Superior Court of the District of Columbia is a court of general jurisdiction," *DeGroot v. DeGroot*, 939 A.2d 664, 668 (D.C.2008), and there appears to be no D.C. law or rule to preclude the action [8] the trial court erred in dismiss-

---

**6.** It appears that among state courts only Texas has concluded that a state must "opt in" to allow private TCPA claims in state courts, arriving at that conclusion six years after Texas had passed enabling legislation. *See Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*, 184 S.W.3d 707 (Tex.2006); *Autoflex Leasing, Inc. v. Mfr. Auto Leasing, Inc.*, 16 S.W.3d 815 (Tex.App.2000).

**7.** There is no basis in the TCPA to conclude that due to circumstances "unique" to the court's budgeting in the District of Columbia, Congress intended that a different enforcement scheme would apply in this jurisdiction. Even if that could be a reason for the Council of the District of Columbia to pass legislation purporting to "opt out" of the TCPA private cause of action, it has not done so.

**8.** In light of the presumption that federal statutes are enforceable in state courts, we do not understand the enforcement scheme under the District's statute prohibiting unsolicited telephone solicitations—which provides for enforcement by the Attorney General without provision for a private cause of action, *see* D.C.Code 34–1701(b)(5), and which was enacted before the TCPA—as an implicit rejection of the notion that the private cause of

action subsequently created by Congress in the TCPA should be cognizable in the District of Columbia. *See Condon*, 855 So.2d at 648 (noting that because state law providing for enforcement by attorney general preceded enactment of the TCPA, court did "not consider it as a legislative refusal to permit a private cause of action under this later-enacted federal law"). Nor do we think that the District's enactment of legislation to prohibit unsolicited telephone calls, but not unsolicited faxes, should be interpreted as an implicit rejection of the right to bring a private cause of action under the TCPA for unsolicited faxes. As noted, the District's statute, D.C.Code § 34–1701, was enacted just as Congress was considering the TCPA. The subsequent inaction of the Council of the District of Columbia to expand the District's statute to cover facsimiles could just as well be interpreted as a recognition that after the federal statute, further local legislation was unnecessary to protect District residents from unsolicited commercial faxes. *See In re Fax.com, Inc.*, 19 F.C.C.R. 748 (2004) (noting that TCPA's prohibitions apply to both interstate and intrastate transmissions) (citing 47 U.S.C. §§ 152(b) & 227(e)). Consequently, we need not decide whether the District of Columbia is

ing the complaint for failure to state a claim under the TCPA.

## IV.

■ Having concluded that the TCPA is enforceable by private action in the District of Columbia, we must now decide whether the trial court erred in dismissing the complaint on the alternative ground that some of the defendants were mere "service providers" and therefore not liable under the Act. We hold that it did.

The TCPA provides that "it shall be unlawful for *any person* within the United States to use any telephone facsimile machine ... *to send* an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1) (emphasis added). The trial court concluded that "facsimile broadcast service providers are not 'messenger senders' and thus, are not responsible for alleged violations of the TCPA." The trial court based its decision on several FCC rulings. First, it cited the FCC's 1992 Regulations Implementing the TCPA, see *supra*, which provided that "in the absence of a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions, common carriers will not be held liable for the transmissions of a prohibited facsimile message." Order at 12 (quoting In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 F.C.C.R. at 8770). The trial court also relied on a subsequent FCC ruling, issued in 1995, which clarified that

the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertise-

ments, and that fax broadcasters are not liable for compliance with this rule. This interpretation is consistent with the TCPA's legislative history, and with our finding in the Report and Order that carriers will not be held liable for the transmission of a prohibited message. *Id.* (quoting In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 10 F.C.C.R. 12391, 12407 (1995)). Finally, the trial court noted an FCC ruling from 1997 which concluded that "the sender of a facsimile message is the creator of the content of the message." *Id.* at 13 (quoting In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 12 F.C.C.R. 4609, 4613 (1997)).

In enforcing the TCPA, however, the FCC has emphasized that because the statute makes it unlawful for "any person ... to send ..." unsolicited fax advertisements, a fax broadcaster that serves as " 'more than a mere conduit for third party faxes' is liable under the TCPA." *In re Fax.com, Inc.,* 19 F.C.C.R. at 755 (quoting *Texas v. American Blastfax, Inc.,* 121 F.Supp.2d 1085, 1089–90 & n. 6 (W.D.Tex. 2000) (rejecting prior FCC rulings that fax broadcasters are not liable in favor of an interpretation that to be liable under the TCPA a defendant needs to be "more than a common carrier[,] or service provider, ... [or] more than a mere conduit"))[9]. In sum, the FCC regulation establishing that the liability of fax broadcasters depends on whether the broadcaster has had a "high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions," 47 C.F.R. § 64.1200(a)(3)(vii)

free to "opt out" of the TCPA's scheme providing for private causes of action in "state" courts.

9. In this case, the trial court rejected the reasoning in *American Blastfax, Inc.,* relying instead on the FCC's earlier interpretations, without realizing that the FCC subsequently adopted the *American Blastfax* approach.

(2007), has been interpreted in enforcement actions as imposing liability on broadcasters that "serve as more than a mere conduit for third party faxes." 19 F.C.C.R. at 788. As in the case of the interpretation of the TCPA's provision for private causes of action in state court, we defer to an agency's reasonable interpretation of who may be held liable under a statute it is charged with implementing, *see Chevron U.S.A., Inc.,* 467 U.S. at 844, 104 S.Ct. 2778, and review the trial court's determination that several of the defendants could not be held liable under the standard that the FCC has established.

In this case, no discovery had been conducted before the motion to dismiss was decided. In dismissing the complaint under Rule 12(b)(6), the trial court relied solely on the allegations in the complaint, and found that even viewing the complaint's allegations as true, appellees Vision Lab Telecommunications, Inc., MediaStealth.com, Douglas Black, Michael Cole, Worldwide Marketing, Inc., and Cynet, Inc. would not be liable under the TCPA because they "did not create the content of the message nor was the fax transmitted on their behalf." In doing so, the trial court discounted the allegation in appellant's complaint that these defendants "were significantly involved in the development of the content to be faxed" by providing the "proprietary software of Cynet and Vision Lab, and their secure websites to translate the Investors' Alert [newsletters] into digital format suitable for the transmissions to be made using the defendants' methods and facilities," because the trial court considered that these

activities "do[ ] not equate to creating new content." But as discussed, *supra,* FCC rulings do not require as a condition of liability under the TCPA that the "sender" be the "creator" of the content. *See In re Fax.com,* 19 F.C.C.R. at 749 (finding liability where company "specializes in transmitting its clients' advertisements to telephone facsimile machines where numbers are contained in [its] data base ... [and] offers to design or improve its clients' advertising copy"); *American Blastfax, Inc.,* 121 F.Supp.2d at 1089 (company more than a common carrier or service provider and liable under TCPA where it "maintains and uses a database of recipient fax numbers, actively solicits third party advertisers and presumably reviews the content of the fax advertisements it sends"). The trial court also disregarded some of appellant's other assertions, for example, that Cynet and Vision Lab "provided ... lists of facsimile numbers" and "used [their] proprietary software and websites on the Internet to control the content and format of Investors' Alert, translate the content of Investors' Alert into a form that suited their transmission capabilities; determined the precise times and destinations of the transmissions; and generated and forwarded to the other Defendants detailed reports containing data on the transmissions." [10] If assumed to be true—as they must be for purposes of a Rule 12(b)(6) motion, *see Atkins v. Indus. Telecomms. Ass'n, Inc.,* 660 A.2d 885, 887 (D.C.1995), these allegations in the complaint would take these defendants out of the category of "mere conduits for third party faxes." [11] Discovery will reveal

---

10. The complaint alleges that Cole, Black and MediaStealth "acted as agents of Vision Lab in all of its activities, and acted as liaisons with the other Defendants and with non-parties in coordinating and executing the steps necessary to accomplish the broadcast fax transmissions."

11. In 2006, after the trial court's dismissal of the complaint in this case, the FCC ruled:
    Under the current rules, a fax broadcaster also will be liable for an unsolicited fax if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such fac-

whether the defendants' level of involvement in the unsolicited fax advertisement operation actually went beyond that of "mere conduits," and, as alleged in the complaint, included, for example, the provision of fax numbers. Therefore, we conclude that based only on the complaint, dismissal was improper. Further discovery as to the precise role that these defendants played in the overall advertisement operation is necessary before the trial judge can determine whether they may be held liable under the TCPA.[12]

Accordingly, we reverse the dismissal of appellant's complaint and remand for further proceedings consistent with this opinion.[13]

*So ordered.*

---

simile advertisements, and the Commission will continue to apply this standard under our revised rules. If the fax broadcaster supplies the fax numbers used to transmit the advertisement, for example, the fax broadcaster will be liable for any unsolicited advertisements faxed to consumers and businesses without their prior express invitation or permission. *The Commission finds that a fax broadcaster that provides a source of fax numbers, makes representations about the legality of faxing to those numbers or advises a client about how to comply with the fax advertising rules, also demonstrates a high degree of involvement in the transmission of those facsimile advertisements.* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed.Reg. 25967, 25971 (proposed May 3, 2006) (codified at 47 C.F.R. pt. 64) (emphasis added).

12. The complaint alleged that appellees "conduct[ed] business and engaged in a regular course of conduct in the District via repeated and targeted transmissions of fax advertisements to persons in the District." Except in the case of Pecan Tree Consulting, the trial court recognized that further discovery was necessary to determine whether the other defendants have the minimum contacts with this forum necessary to be subject to the court's personal jurisdiction. We conclude that the lack of discovery also renders premature the trial court's decision that the court had no personal jurisdiction over Pecan Tree Consulting. Although the trial court concluded that Pecan Tree provided only "financial and/or administrative assistance" to the advertising operation, and did not send any faxes or target any business in the District of Columbia, the complaint avers that "the Loyd companies ... conduct overlapping business transactions, cannot be distinguished among each other, and are used interchangeably in the business practices of Defendant Loyd." As Pecan Tree is allegedly one of Loyd's companies, and, according to the complaint may have conducted some of the advertising itself, or operated as an *alter ego* of Loyd or the companies he controls, discovery is required to determine whether Pecan Tree had the required minimum contacts with the District so as to make it subject to personal jurisdiction in the present action. *See Jackson v. Loews Wash. Cinemas, Inc.,* 944 A.2d 1088, 1095–98 (D.C.2008) (discussing evidence necessary to establish agency relationship or to pierce the corporate veil so as to establish personal jurisdiction).

13. Appellant's counsel filed a motion to dismiss the appeal with respect to Vision Lab Telecommunications, Inc., following a settlement between that appellee and six members of the purported plaintiff class. As we are remanding the case to the trial court, we remand as well for initial decision by the trial court the request to dismiss the lawsuit against Vision Lab in light of the pending motion for class certification. *See* Super. Ct. Civ. R. 23(e) (requiring approval of court before dismissing or compromising a class action).